### VROMAN v. KRYN et al.

#### (Supreme Court, Appellate Term. January 19, 1904.)

1. WITNESSES—CROSS-EXAMINATION—IMPEACHMENT.

In an action to recover for work in polishing diamonds, defendant sought to set off the value of a diamond, which was lost by plaintiff, while polishing it, by reason of a breaking of the machine used in polishing, furnished by defendant to plaintiff for a consideration. Defendant, on his cross-examination, denied that he had announced to the Diamond Setters' Union that he would not permit employment of helpers in his establishment, who were necessary in the use of a safer machine. *Held*, that as plaintiff was not liable for the loss of the diamond, if occasioned by the defective machine, the matter was not collateral, merely, and he was entitled to impeach the defendant by proving that he had made such statement.

2. BAILEE FOR HIRE—LOSS OF PROPERTY.

In an action by plaintiff to recover for work in polishing diamonds, defendant was not entitled to set off the value of a diamond lost in the course of the work by a defect in the machine furnished by defendant, who objected to the use of any other style of machine.

Appeal from Municipal Court, Borough of Manhattan, Seventh District.

Action by Elias Vroman against Jacques Kryn and others. From a judgment for plaintiff, he appeals on the ground of insufficiency of the amount. Reversed.

Argued before FREEDMAN, P. J., and GILDERSLEEVE and GREENBAUM, JJ.

Hymes, Woytisek & Schaap (M. Schaap, of counsel), for appellant.
Turner, Rolston & Horan (E. F. Horan, of counsel), for respondents.

GILDERSLEEVE, J. The parties, at the commencement of the trial, consented to the entry in the minutes of the following stipulation as to the facts of the case, viz.:

"It is stipulated that a lot of diamonds, on the 29th of September, 1902, belonging to the defendants, were delivered to the plaintiff for the purpose of being polished by the plaintiff. On the return of the diamonds polished, plaintiff would be entitled to receive, for his work returned and services, the sum of $124.36, less $12.94 paid by plaintiff for the use of a bench, to be deducted from the $124.36. Plaintiff did return the diamonds polished, save and except one stone, of the value of $85. Plaintiff claims that he is relieved of this liability of $85, and will adduce proof in support of the claim. Defendant charges, and will adduce proof substantiating his claim, that plaintiff is properly chargeable with the $85. That is the contention and issue involved in this suit. There is no dispute, in any event, that plaintiff would be entitled to a judgment of $26.42; being the difference between $85 and $124.36, less $12.94."

The plaintiff's counsel thereupon stated as follows:

"I do not want it to be assumed or inferred from that stipulation that I concede it was any part of the contract, when the plaintiff obtained the stones, that he was to be paid only if they were returned."

Plaintiff was then asked by his counsel:

"Q. What has become of this one stone, which was referred to, which was not delivered to defendants? A. I cannot state. It is impossible to tell, if one is thrown off the wheel—to say where it was. Of course, if I found it, then, of course, it would be returned. I did not find it, and cannot tell where it is. I discovered its loss the very moment it flew out of the dub."

He then went on to illustrate the working of a "dub" in polishing diamonds, and endeavored to show that the loss of the diamond was not owing to his own negligence. One E. Polak was next called by plaintiff, and this witness stated that he was present at the time of the loss of the diamond while it was being polished by plaintiff. His testimony was as follows:

"Q. What did you see? A. I set a stone. I have seen them setting the stone in the dub—putting them on the wheel—and seeing the grinding stone; and all I know was, the stone flew away, but afterwards I do not know anything."

He also states that he saw the dub after the stone had "flown away," and that "the tooth was broken."

The plaintiff swears that, when he started to turn the stone in the dub, the tooth of the dub was not broken. He also swears that the style of dub used was inferior to the "solder dub," but that defendants required him to use that particular kind of dub in preference to the solder. His testimony is as follows:

"One of the teeth of this fork [in the dub] broke, and the stone flew away. This dub—the one in which the stone in question was—I obtained from Kryn & Waters [defendants] on the day I used it, and I used it in exactly the same condition in which I got it. Q. Was there anything on the dub or teeth to indicate that the tooth might break? A. I looked at them every time before I used them, but could not detect any flaw."

It appears from the plaintiff's testimony, which is apparently uncontradicted on this point, that the method of polishing diamonds is to insert the stone in a sort of vise, which the plaintiff calls a "dub," in which it is held against a revolving wheel, making about 2,500 to

3,500 revolutions a minute; and plaintiff swears, as we have seen, that the tooth of the dub in question, which plaintiff received from defendants for the purpose of polishing the diamonds in question, broke, and that the diamond "flew away," and was never recovered, although plaintiff looked for it, as he says, "every day for eight days until 8 o'clock at night."

The defendant Waters denied, in a general way, that plaintiff was compelled to use a particular kind of dub. His testimony on this point runs as follows, viz.:

"Q. Do you direct any of the polishers to use this particular dub? A. No, sir; I never will take that responsibility—to say something like that."

Previous to this he says:

"Every tool belongs to the polisher. Q. They bring their own tools? A. Yes; dubs and everything. Q. Mr. Vroman [plaintiff] has testified he is obliged to use this screw dub. A. I never did. Q. Did you give him that? A. In a certain way."

He then went on to explain that he had got a number of the dubs at a reduced rate, which the polishers could use if they wished to hire them from defendants. He is asked:

"Q. You have a number of these dubs at your place of business? A. Yes. Q. So that the polishers, if they want to use them, may do so? A. That is right. Q. By the Court: You got it [the 'dub'], and then, if they want it, they can hire it from you? A. That is right."

The plaintiff testified that accidents of the kind that resulted in the loss of the diamond were quite common in the use of the style of dub which plaintiff claims defendants required him to use, but that it was very rare for such accidents to occur in the use of the solder dub. Plaintiff further claims that defendants had all the solder dubs taken out of their place of business, and, as we have said, that their polishers were obliged to use the dubs of the kind that plaintiff was operating at the time of the loss of the diamond. The defendant Waters, as we have just seen, states that, although these latter dubs were in the defendants' place of business, still the polishers were not obliged to use them, but could hire them, if they so desired, and that they generally "bring their own tools—dubs and everything." To use the solder dub, it was, apparently, necessary to have an assistant to the polisher, called a "setter" or "versteller"; and, in his endeavor to show that defendants would not permit the use of the solder dub in their place of business, plaintiff's counsel asked defendant Waters on cross-examination:

"Q. What became of these setters that were in your place of business a couple of years ago? A. I had nothing to do with setters. Q. You say the setters were in the employ of the polishers? A. Yes, sir. Q. You had nothing to do with them? A. No, sir. Q. Is it not a fact that about a year ago you announced to the Diamond Setters' Union that you would not allow a setter in your place any more? A. No; it is not a fact. Q. You did not say anything at that time to any person? A. No. Q. Of course, you do not hold any stock or have any interest in this Diamond Dub Company? A. No. Q. You have not any? A. No. Q. Any member of your firm has? A. Yes; it belonged to me about four years ago. Q. This entire patent belonged to you? A. Three or four years ago. But I never made a penny out of it. Q. The old-fashioned dub [the solder], the diamond is always fixed by a setter,

is it not? A. It cannot be otherwise. Q. I am asking you yes or no—what they call a 'versteller'? A. Some polishers do it now without a versteller."

The Diamond Dub Company above mentioned was apparently the maker of the dubs which plaintiff claims the defendants required him to use.

To rebut this testimony of Waters, plaintiff called the witness Benjamin, an officer of the Diamond Workers' Union, and asked him as follows:

"Q. Did you have a conversation with Mr. Waters, the defendant, who was on the stand, with reference to the employment of setters or verstellers? (Objection. Sustained. Exception.) Q. Did Mr. Waters tell you about 9 months or a year ago that he would not allow any versteller or setter in his business? (Same objection. Sustained. Exception.)"

The ground, apparently, upon which the court based its rulings, was that the testimony here sought was upon a collateral matter; that the testimony of Waters, brought out on cross-examination, had nothing to do with anything Waters had stated on his direct examination, but was testimony concerning a fact in reference to which he had not been interrogated; that it was not relevant to the issues; and that the plaintiff, in asking Waters these questions on cross-examination, made Waters his own witness, and was bound by his answers. The questions that were excluded seem pertinent to the issues. As we have seen, plaintiff claims that he was compelled to use a style of dub in which accidents frequently occur, instead of another style, in which they rarely, if ever, occur. Defendant, on his direct examination, denies this, and on his cross-examination is asked if he had stated that he would allow no setters (who are necessary to the working of the latter style of dub) in his place. He replies in the negative, and plaintiff seeks to show that he swears falsely in this respect. If the plaintiff was compelled to use a certain kind of dub, which proved defective, and, through no carelessness or negligence on plaintiff's part, the diamond was lost by reason of the defective dub, the plaintiff is not responsible for such loss. Kafka v. Levensohn, 18 Misc. Rep. 202, 41 N. Y. Supp. 368. There is a sharp conflict of proof upon the question as to whether or not defendants did compel the plaintiff to use this particular kind of dub. The evidence of plaintiff, which on this point is uncontradicted, shows that he was guilty of no negligence, and that the diamond was lost through flying out of the dub; that he examined the dub before using it, and saw nothing to indicate that it was likely to break, or to put him on his guard against accident, except that in this particular kind of dub the stones are apt to fly out "nearly every minute of the day, with every man that uses them." As to the intrinsic merits and defects of the two styles of dubs, plaintiff's testimony is not contradicted. In view of this state of facts, we incline to the opinion that the ruling of the learned justice in excluding the evidence above referred to constitutes reversible error.

There is a claim on the part of the defendants that plaintiff consented to allow defendants to deduct $85 from the amount due plaintiff, if defendants would give plaintiff more work. The evidence on this branch of the case, however, is so hazy and indefinite that it is difficult to determine whether any consideration was really given for such

consent, assuming that plaintiff did so consent. Upon other points, also, the testimony is not very satisfactory, which defect can be remedied upon a second trial.

We fully appreciate what the learned counsel for the respondents says in respect to the nature of this business requiring the highest degree of care, if the owner is to be protected from the persons to whom his diamonds are intrusted for polishing; and we agree with him that this business depends for its success on the fidelity and honesty of the workmen, and that the courts should enforce the rule of strict accountability in cases of loss of the diamonds by the workmen. Nevertheless, if the owner compels the workmen to use a defective machine, and loss occurs through no negligence or dishonesty of the workman, the latter cannot be deprived of pay for his services. As we have seen, there is no affirmative claim of negligence or dishonesty on the part of the plaintiff, while the latter's uncontradicted evidence shows affirmatively that he managed the machine properly and prudently, and that the loss occurred through the defect of the machine. Therefore it would seem that the case hinged upon the question whether or not plaintiff was compelled by defendants to use this kind of machine, and to exclude evidence tending to throw light on that question was error.

The judgment is reversed, and a new trial granted, with costs to plaintiff to abide the event. All concur.

GREENBAUM, J. (concurring). Plaintiff's liability as bailee is concededly predicated upon his negligence. The undisputed testimony is that the machine used for polishing the diamond in question belonged to the defendants, from whom it was hired by the plaintiff for a valuable consideration; that the machine was carefully and prudently managed by plaintiff; that the diamond was lost because of a defect in the dub not obvious when it was put into the dub. Under these circumstances, how can it be said that the diamond was lost through plaintiff's negligence? Plaintiff had a right to assume that the machine hired from the defendants for the express purpose of polishing their diamonds, among which was the lost one, was in perfect condition. In this aspect of the case, it is wholly immaterial whether the plaintiff was or was not obliged to use one of defendants' machines. Under the facts established, there should have been judgment for the plaintiff for the full amount claimed.

The judgment must be reversed, and a new trial granted, with costs to appellant to abide the event.